## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>S.P.,<br><i>a minor, by his parents and next friends,</i><br><i>A.P. and A.P., et al.,</i></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil No. 23-1680-BAH</td></tr>
<tr><td>MONIFA B. MCKNIGHT,<br><i>officially as Superintendent of</i><br><i>Montgomery County Public Schools, et al.,</i></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*   *   *   *   *   *   *   *   *   *   *   *   *   *

### MEMORANDUM OPINION

Plaintiffs S.P., a minor student, and his parents, A.P. and A.P., both on their own behalf and on behalf of their son (collectively "Plaintiffs"), brought suit against Monifa B. McKnight, superintendent of Montgomery County Public Schools, in her official capacity, as well as the Montgomery County Board of Education (collectively "Defendants"), alleging violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA"). ECF 1. Pending before the Court are Plaintiffs' motion for summary judgment, construed as a motion for judgment on the record,[1] ECF 19, and Defendants' cross motion for summary judgment, also

---

[1] "Where no additional evidence is introduced" in an IDEA appeal, "a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record." *Brown v. D.C.*, 568 F. Supp. 2d 44, 50 (D.D.C. 2008) (citing 20 U.S.C. § 1415(i)(2)(C) and *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997)). Here, Plaintiffs have moved to introduce additional evidence. ECF 24. The proposed additional evidence pertains to S.P.'s progress at non-public school since the due process hearing. *See* ECF 24-3. Because the Court determines that this evidence would not alter its analysis below, this motion is **DENIED**. Accordingly, the motions for summary judgment will be construed as motions for judgment on the record.

construed as a motion for judgment on the record, ECF 22. Plaintiffs filed an opposition to Defendants' motion and reply in support of their own motion. ECF 23. Defendants similarly filed a reply in support of their motion. ECF 29. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Plaintiffs' motion for judgment on the record, ECF 19, is **GRANTED in part and DENIED in part**, and Defendants' motion for judgment on the record, ECF 20, is **GRANTED in part and DENIED in part**.

## I.   BACKGROUND

Some background on the IDEA is necessary to contextualize this case. The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education," to protect the rights of such children and their parents, and to facilitate the provision of services to those children. 20 U.S.C. § 1400(d). A "free appropriate public education" ("FAPE") is an education comprised of "special education and related services" that is "provided at public expense . . . without charge," meets state educational standards, includes state public elementary and secondary schools, and is "provided in conformity with the [student's] individualized education program [(an 'IEP')]." § 1400(9). An IEP is an educational plan specifically designed for a student's individual needs based on their disability, their academic progress, and their goals, that outlines the specific services and aids the student will receive in order to reach their goals. § 1414(A). In essence, the IDEA requires that public school systems provide the accommodations a child with a disability requires in order for them to receive an "appropriate" education at no cost, and the school systems do this through utilizing an IEP. *See*

---

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017) (explaining the purpose and requirements of the IDEA).

"The IDEA requires that a child's parents be included in the IEP decisionmaking process as members of the IEP team." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019) (citing 20 U.S.C. § 1414(d)(1)(B)). When parents are dissatisfied with their child's IEP and unable to resolve their concerns with the school-based members of the IEP team directly, the parents can request "a 'due process hearing' before a state or local educational agency." *Endrew F.*, 580 U.S. at 391–92 (citing §§ 1415(f)(1)(A), (g)). "And at the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Id.* (citing § 1415(i)(2)(A)). It is this process that brings the parties before the Court today. [3]

S.P. is a minor student who has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), anxiety disorder, autism spectrum disorder ("ASD" or "autism"), and disruptive mood dysregulation disorder ("DMDD").[4] Decision, at 5 ¶ 3, 7 ¶ 18, 19 ¶ 89. S.P. attended Montgomery County Public Schools ("MCPS"), his local school district, beginning in kindergarten. *Id.* at 5 ¶ 4. In 2014, S.P. received his ADHD and anxiety diagnoses, and MCPS provided him with accommodations under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, while S.P. was still a young elementary school student. *Id.* at 5 ¶¶ 3–5.

---

[3] As explained below, the administrative law judge's factual findings are entitled to deference, and, as such, the facts of this case are pulled from the administrative decision. The facts of this case are laid out in much more detail in the administrative decision. *See S.P. v. Montgomery Cnty. Pub. Schs*, OAH No. MSDE-MONT-OT-22-29029 (Md. Off. Admin. Hr'gs Apr. 7, 2023) ("Decision").

[4] The decision identifies this diagnosis only as "DMDD." Decision, at 19 ¶ 89. This is a common abbreviation known to stand for "disruptive mood dysregulation disorder." *See Disruptive Mood Dysregulation Disorder*, National Institute of Mental Health, https://www.nimh.nih.gov/health/topics/disruptive-mood-dysregulation-disorder-dmdd (last visited Jul. 19, 2024) [https://perma.cc/A8F4-Z43G].

In 2017, S.P.'s mother, A.P., was diagnosed with pancreatic cancer.  Decision, at 6 ¶ 7.
A.P. was "in an out of treatment" for cancer through 2020.[5]  *Id.*  Amidst his mother's cancer
treatment in 2019, when S.P. was in fourth grade, he "refused to attend school." *Id.* at 6 ¶ 8.  In
response, his parents "placed him in a day program at Dominion Hospital." *Id.*  After getting into
a physical fight with another student, S.P. was placed in an inpatient program at the hospital for
five days.  *Id.*  S.P. was subsequently able to transfer back to his local MCPS elementary school
for the remainder of the school year. *Id.*

The following school year, in fall 2019, S.P. was diagnosed with ASD.  Decision, at 7 ¶
18.  In February 2020, MCPS conducted a Functional Behavior Assessment of S.P. and noted that
he struggled with physical and verbal aggression, among other concerns. *Id.* at 6 ¶ 9.  MCPS noted
that S.P. was "more likely to demonstrate aggression when he felt he was being treated unfairly,
or during unstructured times when required to navigate crowds or negotiate with peers." *Id.* ¶ 10.

In May 2020, at the end of S.P.'s fifth grade year, MCPS held a meeting to develop an IEP
for S.P. for the upcoming 2020–2021 school year.[6]  Decision, at 9 ¶ 24.  The IEP focused on the
impacts of S.P.'s autism on his education and provided assorted services and supports for S.P. *Id.*
at 9 ¶ 25, 10 ¶¶ 31–32. The IEP provided that S.P. would be placed in the general education setting
for the majority of the school day, with a fifty-minute resource class outside of the general
education setting each day. *Id.* at 11 ¶¶ 33–34.  All of the services in S.P.'s initial IEP were able

---

[5] Thankfully, by the end of 2020, A.P. was again in remission and remained so at least through the
date of the administrative decision in this case.  Decision, at 6 ¶ 7.

[6] Due to the Covid-19 pandemic, S.P. attended school in an entirely virtual capacity from fall 2020
into the beginning of spring 2021 and switched to a hybrid model in the latter part of spring 2021.
Decision, at 11 ¶¶ 38–39.

to be provided at his local MCPS middle school, Herbert Hoover Middle School ("Hoover"). *Id.* ¶ 33.

S.P. completed his sixth grade school year at Hoover, and the IEP team, including his parents, met again in June 2021 to update his IEP for the 2021–2022 school year. Decision, at 11 ¶ 37, 12 ¶ 44–45. The IEP team again considered the services and supports S.P. needed to be successful in his education and again determined that he should be placed primarily in a general education setting with supports and should attend one self-contained resource class each day to "address his executive functioning deficits." *Id.* at 13–14 ¶¶ 50–53.

S.P.'s aggressive behaviors escalated during the 2021–2022 school year. Decision, at 15 ¶ 60. In an attempt to mitigate this, Hoover staff monitored S.P. during transitions between classes, as the MCPS team had again determined that S.P. was more likely to demonstrate aggression "during unstructured time, when engaged in independent work, or when there was no direct teacher instruction." *Id.* at 15 ¶¶ 60–62. S.P. was suspended from Hoover three times for acts of aggression between November 2021 and March 2022, and he also was required to participate in an "in-school intervention" one day. *Id.* ¶ 65.

Despite these issues, S.P. continued to do well in his classes, many of which were at an advanced level, earning mostly As and Bs. Decision, at 15 ¶ 67. His grades dropped significantly in the third quarter of the year due to his repeated suspensions, but he worked to make up all of his missed assignments and brought his grades back up to As and Bs by the end of his seventh grade school year. *Id.* at 15–16 ¶ 67.

By the middle of the 2021–2022 school year, S.P.'s IEP team was considering placing S.P. in Hoover's Bridge Program, which "focuses more on social-emotional skills as opposed to providing academic supports." Decision, at 16 ¶¶ 68–69. S.P.'s parents opposed this. *Id.* ¶ 70.

Instead, at the March 2022 IEP meeting addressing S.P.'s upcoming eighth grade year, S.P.'s parents requested that S.P. be placed at a program specifically for children with autism at Tilden Middle School, an MCPS school. *Id.* ¶ 73. The MCPS members of the IEP team, however, determined that S.P. did not need the supports offered in the specialized autism program, as "there were no concerns about his academic performance in the general education environment" and that he rather required "more staff support and supervision for unstructured time and transitions." *Id.* at 17 ¶ 74. When the March 2022 meeting concluded, no decision had been reached regarding S.P.'s placement for the following year. *Id.* ¶ 75. While the IEP team was still attempting to reschedule a continuation of the meeting, and with an open invitation on behalf of MCPS to S.P.'s parents to learn more about the program at Tilden Middle School, S.P. had a behavioral incident at home on March 30, 2022. *Id.* at 17–18 ¶¶ 76–80. Shortly thereafter, S.P.'s parents enrolled him at a residential program at Trails Carolina Wilderness Therapy ("Trails") in North Carolina "to avoid physical harm" to S.P. *Id.* at 18 ¶ 82.

On May 24, 2022, S.P. was discharged from Trails, with his primary therapist at Trails noting that S.P.'s "mood dysregulation creates an emotionally and physically unsafe environment for others and prevents him from engaging in academics, extracurricular and social activities." Decision, at 19 ¶¶ 86–87. S.P.'s therapist at Trails recommended that he be placed in a residential program. *Id.* ¶ 86.

S.P.'s parents next placed S.P. at the Life Launch program at Sheppard Pratt Hospital roughly one week after his discharge from Trails. Decision, at 19 ¶ 88. While there, S.P. was diagnosed with DMDD. *Id.* ¶ 89. On June 10, 2022, S.P. was transferred to inpatient treatment at Sheppard Pratt Hospital "due to his escalating behavior." *Id.* at 20 ¶ 91. S.P. was discharged on June 19, 2022. *Id.* ¶ 94. On June 20, 2022, S.P.'s parents enrolled him at a residential program at

the Oakgrove School ("Oakgrove") at Waterfall Canyon Academy ("WCA").[7] *Id.* ¶ 95. S.P.'s parents requested that Defendants fund S.P.'s placement at WCA. *Id.* ¶ 96.

During this period, S.P.'s IEP team was in discussions about his eighth grade IEP. Decision, at 19–21 ¶¶ 90–98. "Emotional disability" was determined to be S.P.'s primary disability for his eighth grade IEP. *Id.* at 21 ¶ 102. On July 13, 2022, the IEP team met and updated S.P.'s IEP. *Id.* ¶ 101. Among other adjustments and additions to the services S.P. would receive in eighth grade, the IEP team agreed that S.P. "required smaller classes that were self-contained to support his social and emotional behaviors" and recommended removing S.P. from the general education environment. *Id.* at 24 ¶ 112. They "ruled out MCPS programs in the general education setting" for S.P. and referred his case to MCPS's Central Placement Unit ("CIEP"). *Id.* ¶ 116. The IEP team determined that it needed more data on S.P.'s performance at the non-MCPS programs before "addressing [S.P.'s] recent behavior." *Id.* ¶ 115.

While S.P.'s case was pending before CIEP, his IEP team proposed "interim services and placement" at Hoover. Decision, at 24 ¶ 117. The interim plan would include general education classes with special education supports in English and math, plus "self-contained classes for science, social studies, Resource, physical education, and electives through the Bridge program." *Id.*

The CIEP team met on August 23, 2022. Decision, at 25 ¶ 120. WCA staff were present at the meeting and provided preliminary reports and anecdotal summaries of S.P.'s progress at WCA. *Id.* ¶ 121. The CIEP team requested additional data from WCA. *Id.* ¶ 122. The CIEP team was next supposed to meet on September 16, 2022, but S.P.'s parents cancelled the meeting.

---

[7] WCA is "a residential treatment center in Utah." Decision, at 35. Oakgrove is the school that educates the youth enrolled at WCA. *See id.* at 55–56.

*Id.* at 26 ¶ 123.  The team next met on October 28, 2022, but "some of the requested data from WCA had still not been provided," so the meeting was continued.  *Id.* ¶ 124.  The next meeting was scheduled for November 28, 2022, but it was cancelled due to a power outage in Montgomery County.  *Id.* ¶ 126.  On November 28, 2022, S.P.'s parents filed their due process complaint.  *Id.* ¶ 127.

The CIEP team was next scheduled to meet on December 21, 2022, but MCPS cancelled the meeting.  Decision, at 26 ¶ 128.  The team finally reconvened on January 20, 2023.  *Id.* ¶ 129. At that point, the CIEP team "ruled out MCPS programs in a comprehensive school setting."  *Id.* The team ultimately proposed referring S.P. to the Regional Institute for Children and Adolescents ("RICA"), a "public separate day school," that the team identified as "the public option" that could implement S.P.'s IEP.  *Id.* ¶ 130.  Until S.P. could be accepted to RICA, though, the team proposed continuing the interim services and placement at Hoover.  *Id.* at 27 ¶ 131.  S.P.'s parents requested a residential placement, but the CIEP team rejected that request.  *Id.* ¶ 132.  As of the date of the due process hearing, S.P. was still enrolled at WCA.  *Id.* ¶ 135.

The due process hearing was held before an ALJ over the span of five days between January and February 2023.  Decision, at 2.  The ALJ issued her decision on April 7, 2023, finding that Defendants had provided S.P. with a FAPE and denying Plaintiffs' request for reimbursement for S.P.'s enrollment at WCA.  *Id.* at 58.  Plaintiffs filed this lawsuit asking that the Court find that Defendants violated Plaintiffs' rights under the IDEA, vacate the ALJ's decision below, and order that Defendants reimburse Plaintiffs for S.P.'s tuition and enrollment expenses at WCA for the 2022–2023 school year.[8]  ECF 1, at 17.

---

[8] Plaintiffs' original complaint also requested that the Court "[o]rder [D]efendant[s] to place and fund S.P. at Waterfall Canyon Academy and declare it to be his current educational placement under the IDEA."  ECF 1, at 17.  Since the complaint was filed, though, Plaintiffs assert that S.P.

## II.  **LEGAL STANDARD**

When faced with for judgment on the administrative record in IDEA cases, this Court conducts "a modified de novo review, 'giving "due weight" to the underlying administrative proceedings.'" *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). The "due weight" standard means that "when an ALJ makes findings of fact 'in a regular manner and with evidentiary support,' those findings 'are entitled to be considered *prima facie* correct,' and 'the district court, if it is not going to follow them, is required to explain why it does not.'" *A.H. v. Smith*, 367 F. Supp. 3d 387, 411 (D. Md. 2019) (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)). "If the reviewing court finds that the administrative authority has departed 'far from the accepted fact-finding process,' the fact-finding is not 'regularly made.'" *S.S. v. Bd. of Educ. of Harford Cnty.*, 498 F. Supp. 3d 761, 775 (D. Md. 2020) (quoting *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011)).

But this deference has its limits. "[E]ven if the factual findings are found to be 'regularly made,' the district court must still make its own independent determination regarding the legal conclusions that have been drawn by the administrative officer." *S.S.*, 498 F. Supp. 3d at 775 (citing *Heffernan*, 642 F.3d at 485). "The Court then reaches its decision based on the preponderance of the evidence." *A.H.*, 367 F. Supp. 3d at 411 (citing *Rowley*, 458 U.S. at 205). And the Court may still choose not to defer to "regularly made" factual findings so long as it explains its reasoning. *Id.* at 412. Nevertheless, "[i]n making this independent decision, courts

---

has completed his course of study at WCA and will be transitioning to the Grove School in Connecticut for the 2024–2025 school year. *See* ECF 23, at 11. As such, the Court considers this particular request for relief to be moot.

should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *R.F.*, 919 F.3d at 245 (quoting *Rowley*, 458 U.S. at 206).

## III.   ANALYSIS

Plaintiffs argue that the ALJ's improperly weighed the evidence presented to her, failed to require Defendants to provide a "cogent and responsive" explanation for its actions, and came to the improper legal conclusions. ECF 19-1, at 15–31. Therefore, they argue, the ALJ's decision is not entitled to deference, and the Court should grant summary judgment to Plaintiffs because (1) Defendants failed to propose a placement for S.P. for the 2022–2023 school year; (2) Defendants denied S.P.'s parents meaningful participation in the IEP process; (3) the IEP proposed by Defendants for the 2022–2023 school year failed to provide S.P. with a FAPE because it failed to provide for a residential placement; (4) Defendants are unable to provide "cogent and responsive" explanations for their actions; and (5) reimbursement for S.P.'s tuition and expenses at WCA is appropriate because WCA was a proper placement for S.P. *Id.* at 15–35. Defendants counter that it is they who are entitled to summary judgment because (1) the ALJ properly considered the evidence and her decision is therefore entitled to deference; (2) Defendants offered a FAPE to S.P. for the 2022–2023 school year; (3) Plaintiffs failed to establish that S.P. requires a residential placement; and (4) WCA is not a proper placement for S.P.[9] ECF 22-2, at 23–37.

---

[9] Defendants also argue that Plaintiffs did not engage in the IEP process in good faith. *See* ECF 22-2, at 39 ("Such conduct does not reflect good faith participation in the IEP process."). Specifically, Defendants assert that Plaintiffs were determined to place S.P. at WCA for the 2022–2023 school year, regardless of the IEP Defendants developed for him. *Id.* at 37–39. But the mere fact that Plaintiffs placed S.P. at a program they felt was appropriate for him and were making preparations for him to complete the school year there—an undeniably appropriate course of action if Defendants had not been able to offer him a FAPE—is not indicative that they were unwilling to consider a placement proposed by Defendants. *See Kitchelt ex rel. Kitchelt v. Weast*, 341 F. Supp. 2d 553, 557 n.1 (D. Md. 2004) ("The mere fact that parents may enroll their child in a private school while the IEP process is underway . . . is not by itself proof of bad faith on their part."). This determination is only bolstered by S.P.'s parents' long-time involvement with the IEP process and their previous attempt to have S.P. placed at an autism-focused program at an MCPS school.

This is a challenging case involving the education of a student who, though by all accounts academically gifted, was struggling with mental health and learning disabilities that impeded his ability to succeed in school. For the reasons that follow, the Court finds that Defendants failed to offer S.P. with a FAPE from the beginning of the 2022–2023 school year through the time of the due process hearing, and that Plaintiffs are entitled to partial reimbursement for S.P.'s enrollment at CWA during that time.

### A.    The ALJ's factual findings were regularly made and are thus entitled to "due weight."

Plaintiffs assert that the ALJ's analysis was flawed and therefore her findings of fact are not entitled to deference. *See* ECF 19-1, at 15–34. But though Plaintiffs take issue with the ALJ's conclusions and credibility determinations, the operative question in determining whether an ALJ's factual findings are entitled to "due weight" is whether the findings were "regularly made," which is a question of the *process* by which the ALJ made their findings. *S.S.*, 498 F. Supp. 3d at 776–77 (*citing Cnty. Sch. Bd. of Henrico Cnty v. Z.P.*, 399 F.3d 298, 305 (4th Cir. 2005)). Courts in the Fourth Circuit generally find that an ALJ has made their findings in the regular manner so long as the ALJ "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual

---

*See, e.g.*, Decision, at 17 ¶ 77 (describing S.P.'s parents' initial desire to have him placed at Tilden Middle School's autism-centered program). The fact that S.P.'s parents were not able to immediately turn over the data requested by Defendants is also not determinative on this point, especially when considering that this data spanned programs across the country and included several very specific requests. *See* ECF 22-2, at 38 ("Nevertheless, despite the clear and repeated written and verbal requests for such data, the Plaintiffs took more than three months to provide the CIEP team the majority of the data requested at the August 2022 CIEP."); Decision, at 25 ¶ 122 (listing out specific requests for data from WCA). It is undeniable that, at some point, discussions between Plaintiffs and Defendants took on an adversarial tone, but "parents taking an adversarial or uncooperative stance in advocating for their child's right to a FAPE" alone does not indicate bad faith. *Justin G. ex rel. Gene R. v. Bd. of Educ. of Montgomery Cnty.*, 148 F. Supp. 2d 576, 586 (D. Md. 2001)

questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [their] responsibility to decide the case." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008). Here, there is every indication that the ALJ followed the proper process. The ALJ heard five days of testimony and considered more than 120 exhibits. Decision, at 2; Decision File Exhibit List, at 3–8. The hearing included witnesses from each side with both direct examination and cross examination of each witness by the parties' counsel. *See, e.g.*, Transcript,[10] at 38–108 (showing testimony, including direct and cross examination, of first witness). Though the analysis in the decision may not be to Plaintiffs' liking, it is clear that the ALJ weighed the evidence before her and came to reasoned conclusions. *See* Decision, at 36–57 (showing over 20 pages of analysis). As such, the ALJ's findings were "regularly made" and this Court will afford the administrative decision "due weight," taking all factual findings as prima facie correct. *See A.H.*, 367 F. Supp. 3d at 411. Even so, the Court still engages in its own review of the evidence and makes all legal conclusions de novo. *See M.M.*, 303 F.3d at 530–31.

**B.    MCPS failed to offer S.P. a FAPE for the 2022–2023 school year.**

Under the IDEA, Defendants were required to offer S.P. a FAPE. 20 U.S.C. § 1400(d). The Supreme Court provided insight into what exactly a FAPE requires in *Endrew F.* 580 U.S. at 399. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* The Court also clarified that a FAPE need not be an "ideal" education; it must only be "*reasonable*." *Id.* (emphasis in original). The aim is to "enable the child to make progress." *Id.* And while passing grades are not an automatic indication that a child is receiving a FAPE, "[w]hen a child is fully integrated in the regular classroom, as the [IDEA] prefers, what that typically means

---

[10] Citations to the transcript of the hearing in *S.P. v. Montgomery Cnty. Pub. Schs*, OAH No. MSDE-MONT-OT-22-29029 (Md. Off. Admin. Hr'gs Apr. 7, 2023) are indicated as "Transcript."

is providing a level of instruction reasonably calculated to permit advancement through the general curriculum." *Id.* at 402, 402 n.2.

Additionally, "[t]he IDEA requires participating states to educate children with disabilities in the [least restrictive environment]—that is, alongside children who are not disabled '[t]o the maximum extent appropriate.'" *R.F.*, 919 F.3d at 246 (quoting 20 U.S.C. § 1412(a)(5)). Generally, children with disabilities are to be removed from the "the regular educational environment . . . only when the nature or severity of the disability of a child is such that education in regular classes [with appropriate supports] cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)); *see also R.F.*, 919 F.3d at 246 (quoting the same).

Here, the school year in question is the 2022–2023 school year. *See* ECF 1, at 17. That school year began with S.P. enrolled at WCA and much back-and-forth regarding the development of an IEP for S.P. at MCPS. *See* Decision, at 20–26 ¶¶ 98–126. As early as July 13, 2022, the IEP team "ruled out MCPS programs in the general education setting" for S.P. *Id.* at 24 ¶ 116; *see also* Transcript, at 841:8–843:12 (explaining that, as of July 2022, the IEP team determined that "there was no [MCPS] placement that was appropriate" for S.P.); Transcript, at 933:23–935:10 (explaining that "[t]here wasn't a program at the local school level that could provide a fully self-contained day for [S.P.]" at MCPS). In January 2023, the CIEP team "ruled out MCPS programs in a comprehensive school setting." *Id.* at 26 ¶ 129. The CIEP team determined that the only public school that could offer S.P. a FAPE was RICA. *Id.* ¶ 130 ("The CIEP team proposed placement of the Student at [RICA] as '*the* public option that could address the IEP goals and provide an appropriate educational benefit . . . .'" (emphasis added)). The IEP team prepared an interim services and placement plan for S.P. to be implemented while he was awaiting admission to RICA. Decision, at 24 ¶ 117. This interim services and placement plan called for S.P. to be

placed at Hoover in the Bridge program, including placement in a general education setting with additional supports for two of his classes, despite the IEP team having established in July 2022 that S.P. could not receive a FAPE under those conditions. *Id.*

S.P. was never admitted to RICA. The evidence suggests that S.P.'s parents did their best to comply with the admissions procedure at RICA, but that they were concerned about having S.P. complete an admissions interview due to guidance from S.P.'s therapist at WCA. Decision, at 55 n.101; *see also* Transcript, at 515:3–516:2 (S.P.'s father explaining that he and S.P.'s mother had been in ongoing conversation with RICA); Transcript, at 1240:1–9 (MCPS witness explaining that they were aware that S.P.'s parents had met with RICA). S.P.'s father testified that he and S.P.'s mother were not informed failure to facilitate an interview for S.P. with RICA would result in denial of S.P.'s access to RICA.[11] Transcript, at 515:23–516:2. Because S.P. was not admitted to RICA, his interim services and placement continued as his proposed education plan at MCPS. *Id.*

Several cases, when considered together, are useful in discerning whether S.P. was offered a FAPE. In *A.K. ex rel. J.K. v. Alexandria City School Board*, the Fourth Circuit found that the school district had failed to provide a FAPE to a student because the district failed to identify any placement at which the student could obtain the services and programming identified in the IEP as necessary to provide the student with an appropriate education. 484 F.3d 672, 681 (4th Cir. 2007). The Fourth Circuit distinguished *A.K.* from the case before it in *Shaw v. Weast* when the school system "made a referral to three therapeutic day school programs," none of which were ultimately able to accept the student, but the school system had also provided for an interim plan for the student to continue at her local school, "a school that [the school district] believed could

---

[11] None of Defendants' witnesses testified that the parents were, in fact, so informed, and the ALJ made no findings on this point.

implement [the student's] IEP." *Shaw v. Weast*, 364 F. App'x 47, 52–53 (4th Cir. 2010). Several cases since *A.K.* and *Shaw* have refined this premise, holding that when a school board identifies a placement for a student that could provide a FAPE, but that placement is subsequently unavailable to a student due to the bad faith actions of the student's parents, the school system has not violated the IDEA. *See C.K. ex rel. A.K. v. Baltimore City Bd. of Commissioners*, Civ. No. 22-804, 2023 WL 3740555, at *10 (D. Md. May 31, 2023); *M.C. v. Starr*, Civ. No. DKC-13-3617, 2014 WL 7404576, at *8 (D. Md. Dec. 29, 2014). Taking all of this together, Plaintiffs here can meet their burden to show that Defendants denied S.P. a FAPE if they can demonstrate that: (1) the interim IEP proposed by Defendants did not provide S.P. with a FAPE, and (2) S.P. and his parents engaged in the application process for RICA in good faith but were denied.

MCPS staff agreed as early as July 2022 that Hoover was unable to offer S.P. an appropriate education, even through the Bridges program or other special education offerings at the school. *See* Decision, at 24 ¶ 116; *see also* Transcript, at 841:8–843:12. The CIEP team determined that the only public school that could offer S.P. a FAPE was RICA. Decision, at 26 ¶ 130 ("The CIEP team proposed placement of the Student at [RICA] as '*the* public option that could address the IEP goals and provide an appropriate educational benefit . . . .'" (emphasis added)). The ALJ found otherwise, but this Court is required to give due weight not just to the factual findings of the ALJ, but also to the opinions of school officials. *See Endrew F.*, 580 U.S. at 403–04. Given that Defendants themselves believed that S.P.'s IEP was unable to be implemented at Hoover, and that the interim IEP called for his placement there, this Court disagrees with the ALJ and finds that the interim IEP failed to provide S.P. with a FAPE.

This inquiry, then, truly turns on the engagement of Plaintiffs with the application process to RICA.[12] It is important to note that while it is Plaintiffs' burden to show that Defendants denied S.P. a FAPE, they are not required to affirmatively prove that they acted in good faith. *See Board of Educ. Of Frederick Cnty. v. I.S. ex rel. Summers*, 325 F. Supp. 2d 565, 589 (D. Md. 2004) (rejecting the school district's argument that the parents did not act in good faith because there was "no evidence that the [p]arents acted in bad faith"); *Aaron P. v. Hawaii, Dept. of Educ.*, 897 F. Supp. 2d 1004, 1029–1030 (D. Haw. 2012) (finding that there was no basis for a denial of tuition reimbursement for lack of good faith when the record did not show the parents acted in bad faith). Thus, it is Defendants' burden to produce evidence showing Plaintiffs' bad faith, and they have failed to do so.

Defendants argue that this case is similar to *M.C.*, where MCPS referred a student to RICA as an appropriate placement to implement her IEP, but "no specific school was ever selected due to M.C.'s parents' refusal to make her available for an interview." 2014 WL 7404576, at *8. The parents in *M.C.* visited RICA, determined that it was an "inappropriate placement," and "rejected it" before even beginning the application process. *Id.* at *5. When MCPS proposed a second alternative school, the parents again visited the school and rejected it. *Id.* Both schools ultimately rejected the student. *Id.* When MPCS staff followed up with RICA, the director of clinical services explained that the rejection "was based on (1) verbal reports from her parents and therapist about her current presentation of emotional fragility, difficulty transitioning and unpredictable triggers,

---

[12] Though these events played out after Plaintiffs had submitted their due process complaint, substantial testimony regarding this process was heard at the administrative hearing, and the ALJ made findings related to the application process at RICA. *See* Decision, at 36 (explaining that Plaintiffs presented extensive testimony regarding the referral to RICA and subsequent events at the hearing).

and (2) [o]ur preadmission interviewer . . . was recommended against having a telephone interview

with M.C., by the parents and therapist, given her fragility and minimal progress." *Id.*

      The facts here bear some similarities to *M.C.*, certainly, but with important distinctions. In

*M.C.*, there was ample evidence that the parents actively refused placement at RICA or the other

proposed school, and that they actively frustrated the application process. *See* 2014 WL 7404576,

at *5. There is no such evidence here. The ALJ here found that S.P.'s parents had "completed the

application and interviewed with [RICA] team members." Decision, at 55 n.101. RICA was not

able to interview S.P., however, because S.P.'s "therapist at WCA[] determined that an interview

with RICA would be 'completely detrimental to [S.P.'s] treatment' at WCA." *Id.* S.P.'s father

was emphatic at the hearing that, though he and S.P.'s mother were concerned about the impact of

an interview on S.P., they did not communicate that they would not allow it, and they put RICA

in touch with S.P.'s WCA therapist to discuss the impacts the process would have on S.P.

Transcript, at 1443:4–6 ("I am quite certain we said we were very concerned about him

participating. But we did not say he would not participate."); Transcript, at 1433:14–25 ("Q: Did

you ask . . . the RICA admissions team to talk to [S.P.'s therapist]? A: Yes. . . . we wanted to make

sure that she had context and could get an understanding . . . about how he's doing and his current

mental state."). RICA's notes regarding the rejection of S.P. from the program do not reflect that

the parents did not make S.P. available; they instead explain that RICA had chosen not to interview

S.P. because his therapist said it would be detrimental to his treatment. Transcript, at 1351:22–

1352:5.

      Though both the parents in *M.C.* and the parents here expressed concerns about the impact

of an interview on the student, this was not the sole determining factor that led the Court in *M.C.*

to find that the parents had not cooperated with the school system in trying to get their daughter

an appropriate placement. There, the parents' attorney acknowledged that the parents knew that an interview with M.C. was a requirement for admission to RICA, and the ALJ found that the parents' stalwart opposition to any interview of M.C. amounted to a refusal. *See* 2014 WL 7404576, at \*9. This evidence is not present here. The ALJ here expressed no concern over the parents' role in the RICA application process. Despite S.P.'s parents' concerns over how he would respond to an interview, they cooperated with RICA's admissions process. They completed their application. Decision, at 55 n.101. They themselves interviewed with RICA, and they put RICA in touch with S.P.'s WCA therapist to discuss an interview with S.P. *Id.* S.P.'s parents cannot be faulted for expressing concern for their son's wellbeing when they nevertheless complied with the admissions process for RICA and when no evidence has been presented that their expression of concern went so far as to amount to a refusal. As such, this case is distinguishable from *M.C.* in that S.P.'s parents participated in the RICA admissions process in good faith, and yet S.P. was still denied admission.

The end result is that, despite all parties seemingly acting in good faith, there was no FAPE available to S.P. during the 2022–2023 school year. He could not enroll in RICA, the only school identified as being able to implement his IEP, and the interim IEP was admittedly insufficient to provide him a FAPE. As such, Defendants failed to provide S.P. with a FAPE for the 2022–2023 school year as of the date of the due process hearing.

**C.     Plaintiffs are entitled to partial reimbursement for S.P.'s enrollment at WCA.**

The determination that S.P. was denied a FAPE for the 2022–2023 school year does not complete the Court's inquiry. Plaintiffs seek reimbursement for S.P.'s tuition and related expenses at WCA for the 2022–2023 school year. ECF 1, at 17. In order for Plaintiffs to be eligible to receive reimbursement for S.P.'s tuition at WCA, Plaintiffs must show that WCA—and Oakgrove, WCA's academic program—was a proper placement for S.P. *M.S. ex rel. Simchick v. Fairfax*

*Cnty. Sch. Bd.*, 553 F.3d 315, 323–24 (4th Cir. 2009) (citing *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 369 (1985)). "The IDEA provides for parental reimbursement for private placements if (1) the school district fails to provide a FAPE and (2) the parental placement is appropriate." *M.S.,* 553 F.3d at 323–24 (citing *Sch. Comm. of Burlington,* 471 U.S. at 369). A private school at which a parents place a child need not be approved by the public school district, and such a placement is "appropriate" if it is "reasonably calculated to enable the child to receive educational benefits." *Carter v. Florence County Sch. Dist. Four,* 950 F.2d 156, 163–64 (4th Cir. 1991)). The ALJ found that S.P. was not receiving a FAPE at Oakgrove, but parental placements need not provide an education that rises to the level of FAPE in order to be eligible for reimbursement. *See M.G. v. McKnight*, 653 F. Supp. 3d 202, 215 (D. Md. 2023) (noting that parental placement standard is lower than the standard applied to assess whether a student has been provided a FAPE).

It cannot be said that S.P. was receiving a rigorous education at Oakgrove. S.P. has always been a high-achieving student academically, and Oakgrove is not a school that is designed to provide academically challenging courses. *See* Decision, at 56 (noting that many of the students at Oakgrove are "not on a diploma track" and that those students are "not taught separately from diploma-track students"). Still, Oakgrove was responsive to S.P.'s needs and ensured that he was progressing in his education. For example, when Oakgrove realized that S.P. had already advanced beyond Pre-Algebra, the math course in which it had originally placed him, it transferred him to Geometry instead. Decision, at 56. Furthermore, S.P. earned good grades at Oakgrove, indicating that he was indeed learning and progressing through the curriculum. *See* Decision, at 47 (noting that S.P.'s "academic performance at WCA further generally underscores the fact that [he] is able to access academic instruction and make progress").

The ALJ emphasized that Oakgrove was unlikely to be able to provide all of the services identified in S.P.'s IEP and thus could not provide S.P. with a FAPE. *See* Decision, at 56–57. However, as noted, this is not what is required of a parental placement. Even if Oakgrove was not providing S.P. with the type of challenging academic work that would have been optimal, and even if was not providing him with every support he would have ideally received, the program there was still "reasonably calculated to enable [him] to receive educational benefits." *Carter,* 950 F.2d at 163–64.

At this point, it is necessary to distinguish between benefits S.P. received from WCA's residential program and those he received from Oakgrove's educational program, as the Fourth Circuit has long held these to be distinguishable inquiries. *See Bd. of Educ. of Montgomery Cnty. v. Brett Y,* 155 F.3d 557 (4th Cir. 1998) (quoting *Burke Cnty. Bd. of Educ. v. Denton ex rel. Denton,* 895 F.2d 973, 980 (4th Cir. 1990)) ("[A] residential placement that is necessary for 'medical, social, or emotional problems that are segregable from the learning process' need not be funded by the local education agency."). "Even though mental health issues can interfere with academic progress, the IDEA does not make public school systems responsible for residential placements that primarily address mental health issues." *A.H. ex rel. P.H. v. Arlington Sch. Bd.,* Civ. No. 20-00981, 2021 WL 1269896, at *10–11 (E.D. Va. Apr. 6, 2021) (citing *Shaw,* 364 F. App'x at 53–54). The IDEA does not require reimbursement for residential expenses unless the mental health issues that necessitate the residential program are so intertwined with the student's education that the residential placement is "essential for the child to make *any* educational progress at all." *Shaw*, 364 F. App'x at 53 (emphasis in original) (quoting *Denton*, 895 F.2d at 980). Here, though S.P's parents believed that the residential placement was necessary for S.P.'s own safety, it is not clear that a residential placement was necessary for him to make "*any* educational progress

20

at all." Thus, regardless of how much benefit S.P. may have received from WCA's residential programming, Plaintiffs are not entitled to reimbursement for those services.

Accordingly, Plaintiffs are entitled to some amount of reasonable reimbursement for S.P.'s educational programming at Oakgrove from the start of the 2022–2023 school year until the due process hearing, but not for the costs associated with the residential programming at WCA. *See M.G.*, 653 F. Supp. 3d at 217 (ordering reimbursement only for "educational" and "clinical" components of tuition, but not "residential" component). The record before the Court does not include a breakdown of costs associated with S.P.'s enrollment at WCA and Oakgrove for 2022–2023. The parties are directed to file within 60 days a joint submission as to (1) the costs of S.P.'s enrollment at WCA and Oakgrove; (2) documentation supporting those costs; and (3) the parties' positions regarding the compensable costs in accordance with this opinion.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for judgment on the record, ECF 19, is GRANTED in part and DENIED in part, and Defendants' motion for judgment on the record, ECF 22, is also GRANTED in part and DENIED in part.

A separate implementing Order will issue.

Dated: <u>July 29, 2024</u>                                   _____/s/_____
                                                                              Brendan A. Hurson
                                                                              United States District Judge